**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEISHA JOHNSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.  14-1123 |
| CITY OF PHILADELPHIA, JERROLD | : | |
| BATES, STEPHEN JOHNSON, ALICE | : | |
| MULVEY, and CAROL O'NEILL, | : | |
| | : | |
| Defendants. | : | |

<u>**MEMORANDUM**</u>

BUCKWALTER, S.J.                                                                      March 31, 2015

Currently pending before the Court is the Motion for Partial Summary Judgment by

Defendants City of Philadelphia, Jerrold Bates, Stephen Johnson, Alice Mulvey, and Carol

O'Neill (collectively, "Defendants").  For the following reasons, the Motion is granted.

## I.        FACTUAL BACKGROUND

Plaintiff Keisha Johnson is an African-American female who was employed with the City

of Philadelphia and appointed as a police officer in the Philadelphia Police Department in June

1997.  (Defs.' Statement of Undisputed Facts ("DSUF") ¶ A.1; Pl.'s Response to Statement of

Undisputed Facts ("PRSUF") ¶ 1 A.1.)  Defendant City of Philadelphia is a municipality and an

employer within the meaning of Title VII.  (DSUF ¶ A.2; PRSUF ¶ A.2.)  The individual

Defendants were each employed by the Philadelphia Police Department as follows:  Defendant

Jerrold Bates, Staff Inspector; Defendant Stephen Johnson, Deputy Police Commissioner;

Defendant Charlotte Council, Deputy Police Commissioner; Defendant Alice Mulvey, Chief; and Defendant Carol O'Neill, Captain.  (Compl. ¶¶ 13–14; Answer ¶¶ 13–14.)

In late 2007, Plaintiff began working in the Internal Affairs Bureau ("IAB") of the Philadelphia Police Department as Defendant Jerrold Bates's aide.  (Dep. of Keisha Johnson ("K. Johnson Dep."), 14:14–16, Nov. 17, 2014.)  Beginning in 2007, Bates began complimenting Plaintiff about her figure and looks on a regular basis.[1]  (Id. at 18:16–19:10.)  In 2008, Bates asked Plaintiff to go out with him and she told him that she did not think it was a good idea.  (Id. at 19:19–20:2.)  Thereafter, his conduct escalated.  (Id. at 20:3–6.)  On the first occasion, while Plaintiff and Bates were driving downtown, Bates started discussing sex and indicating that Plaintiff made him "hard."  (Id. at 20:11–22:4.)  He then placed her hand on his penis and asked if she wanted to have sex and, when she refused, he "had an attitude."  (Id. at 22:6–23:17.)  Thereafter, Bates would regularly call Plaintiff on her cell phone and work phone and inquire about her sex life with her boyfriend.  (Id. at 25:11–26:13.)  In the office, he would purposely brush against her behind and ask her to bend over so he could look at her, all the while pretending it was a joke.  (Id. at 26:14–27:24.)

At some point, Plaintiff asked Bates for time off to attend an FBI interview in Washington D.C.  (Id. at 28:1–22.)  Bates responded that he would give her the day off if she let him "suck [her] breasts."  (Id. at 29:1–19.)  She agreed and a couple of days later, in his office,

---

[1]  The recitation of facts regarding Bates's and Plaintiff's relationship are based entirely on Plaintiff's testimony and, for purposes of this summary judgment motion only, are not disputed by Defendants.  The Court summarizes these facts solely for the purpose of putting into context the events relevant to the summary judgment motion.  At any subsequent trial on the merits of the remaining claims, Defendants are not precluded from challenging the veracity of Plaintiff's testimony on this subject.

she lifted her shirt and let him kiss her and suck her breasts.  (Id. at 29:20–31:19.)  Thereafter, the inappropriate comments and contact would occur several times a week.  (Id. at 32:9–34:23.)  During a conversation over her failed FBI application, Bates started rubbing Plaintiff's shoulders to cheer her up and she told him not to touch her.  (Id. at 43:8–14.)  A short time later, he showed her pictures of women on his computer and told her, "Maybe this is not a good fit for you.  You know, maybe you might want to go somewhere else" and "You can be replaced."  (Id. at 43:20–44:10.)  He then explained that some of his previous aides used to perform sexual favors for him and would do so again to have the job.  (Id. at 44:11–45:12.)

        In late 2008 to 2009, Plaintiff became pregnant and Bates did not bother her in a sexual fashion, especially when her daughter suffered multiple issues as a result of her premature birth.  (Id. at 36:21–38:24.)  In 2010, after she returned from maternity leave, Bates's improper behavior towards her resumed.  (Id. at 39:22–40:10.)  In October 2010, Plaintiff had intercourse with Bates as a "birthday present" for him.  (Id. at 40:8–14.)  Plaintiff drove with him to an apartment during lunchtime where Plaintiff and Bates had intercourse on the couch.  (Id. at 46:19–49:1.)  On subsequent occasions, she returned to that apartment to have various sexual relations with him.  (Id. at 49:2–51:2.)  Plaintiff and Bates also engaged in intercourse at his home, her home, and Bates's mother's home.  (Id. at 51:8–53:15.)  Whenever she would tell him "no," he would have a "bad attitude" towards her, belittle her in public, make her feel stupid about her work performance, and make her stay late at work to run errands.  (Id. at 53:15–54:16.)  Plaintiff also sent Bates numerous cell phone pictures of herself, at his request, so he could masturbate when he was home.  (Id. at 69:12–75:11.)  Bates also talked about having Plaintiff go to a hotel with him, which she refused, and he solicited her to have group sex with Corporal Newsome-

3

Middleton and Sergeant Williams, which also did not occur.  (Id. at 75:8–77:4.)  After Plaintiff's boyfriend moved out of her house, Bates started coming to her house for sexual interaction.  (Id. at 83:20–87:6.)  According to Plaintiff, Bates never gave up asking Plaintiff for sex, even when she was leaving the department.  (Id. at 80:17–23.)  Bates would often give her gift cards or cards with money for her birthday, her daughter's birthday, or other special occasions, and she would accept these gifts.  (Id. at 81:5–83:16.)

In 2011, Plaintiff sought help with the Employee Assistance Program ("EAP") because her "life was out of control."  (Id. at 87:8–24.)  Plaintiff did not consider complaining to Deputy Commissioner Steven Johnson, in charge of IAB, or Staff Inspector Denise Turpin because she was getting in trouble for different things at the time, including her dress attire.  (Id. at 88:21–89:14.)  Plaintiff, however, believed she was being targeted by Defendants Bates, Mulvey, and Johnson because she had previously complained about several derogatory comments made by her co-workers.  (Id. at 89:13–24.)  First, in July 2010, Plaintiff overheard Police Officer Lisa Pittoulis, a female officer assigned to IAB, make a remark that a certain inspector "liked his coffee black."  (Id. at 90:2–19; Pl.' s Resp. Opp'n Summ. J., Ex. 14.)  Plaintiff complained about this remark to Defendant Deputy Commissioner Stephen Johnson.  (K. Johnson Dep. 90:20–24.)  Defendant Jeanette Lake Dooley, an Inspector in IAB and Pittoulas's supervisor, counseled Pittoulas that such remarks were inappropriate and unprofessional.  (Defs.' Mot. Summ. J., Ex. 5, Affidavit of Inspector Jeanette Lake Dooley ("Dooley Aff."), ¶¶ 1–4.)  After Plaintiff made that complaint, however, she indicated that several people began "acting funny" towards her, and a few people, including Bates and Commissioner Johnson, made comments about some of the clothing she wore.  (K. Johnson Dep. 91:1–93:20.)  In March of 2012, Plaintiff was formally

counseled about appropriate work attire.  (Pl.'s Resp. Opp'n Summ. J., Ex. 8.)

Plaintiff also had an interpersonal dispute with IAB employee Monica Frysinger in May 2011.  Plaintiff overheard Frysinger comment about Plaintiff, saying she couldn't stand her and that "she looks like a f—ing crack head with her poppy eyes, and she thinks she's hot shit."  (Id. at 94:9–17.)  She reported this comment to Bates and to Corporal Gail Newsome-Middleton, but Deputy Commissioner Johnson later questioned why she reported these remarks.  (Id. at 94:20–95:14.)  According to Kevin Long, a lieutenant in the IAB and supervisor of Monica Frysinger at the time, Frysinger made a comment to the effect that "some people shouldn't make comments about fat people when they are skinny crackheads."  (Defs.' Mot. Summ. J., Ex. 6, Affidavit of Kevin Long ("Long Aff.") ¶¶ 1–4.)  As a result of an investigation, Frysinger was issued a written counseling memorandum outlining the professional demeanor to be exhibited while performing the functions of an employee in the Philadelphia Police Department.  (Id. ¶¶ 5–6.)

At some point in September 2011, Plaintiff faced her own disciplinary action.  Plaintiff explained that both she and her daughter were really sick, but she had already taken a lot of time off.  (K. Johnson Dep. 96:3–21.)  According to Plaintiff, she called work and left a message on Lieutenant Long's voicemail stating that she was taking a sick day.  (Id. at 97:5–12.)  A couple of days after she came back to work, Corporal Newsom-Middleton came to Plaintiff's desk and Plaintiff reiterated to her that she had called out sick because of her daughter.  (Id. at 97:21–98:9.)  According to Plaintiff, she also told Newsom-Middleton that she was supposed to go to her step-father's aunt's funeral that same day, but forgot, and asked her if step-parents' family are considered family for purposes of taking funeral leave.  (Id. at 98:9–24.)  Newsom-

Middleton said they were.  (Id.)  A few days later, Plaintiff received a court notice on her desk indicating that she was the subject of an investigation.  (Id. at 99:5-9.)  When she asked Bates about it, he indicated that Newsom-Middleton had recorded Plaintiff's leave as being funeral-related when Plaintiff did not attend any funeral.  (Id. at 99:10–20.)  Following an extensive investigation by IAB, the Police Department found that Plaintiff had engaged in improper conduct and Plaintiff was formally charged, on December 14, 2011, with violating Article V: Neglect of Duty; Section 5-§011-10; Failure to comply with any Police Commissioner's orders, directives, memorandums or regulations or written orders of superiors.  (Defs.' Mot. Summ. J., Exs. 7, 10.)  Subsequently, Plaintiff attended a hearing before the Police Board of Inquiry ("PBI").  (K. Johnson Dep. 100:17–23.)  Bates was called by Plaintiff's attorney to testify on her behalf, but when he arrived, he told the attorney that there was nothing he could do to help her. (K. Johnson Dep. 101:16–102:1.)  On May 16, 2012, after the hearing, Plaintiff was found guilty of violating Article V: Neglect of Duty; Section 5-§011-10 and recommended for a formal reprimand and transfer to the 15th Police District.  (Defs.' Mot. Summ. J., Ex. 11.)

Immediately thereafter, Plaintiff took a brief FMLA leave and then reported to the 15th District in June 2012.  (K. Johnson Dep. 102:2–24.)  When she arrived at her new assignment, she felt that people knew why she was there and thought she heard people talking about her and calling her a "rat."  (Id. at 103:3–104:22.)  The following Monday, after only one day of work, she went to the Police Advisory Board to tender her resignation.  (Id. at 105:2–16.)

Plaintiff filed her initial charge with the Pennsylvania Human Relations Commission ("PHRC") on March 14, 2012, shortly prior to her PBI hearing, alleging that she was treated differently in the terms and conditions of her employment because of her race and/or sex,

because she opposed perceived employment discrimination, and because she cooperated in an opposition of perceived employment discrimination. (Defs.' Mot. Summ. J., Ex. 12.) On July 3, 2012, Plaintiff filed another charge with the PHRC, setting forth claims of sexual harassment based on her relationship with Bates. (Defs.' Mot. Summ. J., Ex. 15.) Notably, both of her charges were dual-filed with the Equal Employment Opportunity Commission ("EEOC").

Plaintiff received a right-to-sue letter on her employment discrimination charges. (Pl.'s Resp. Opp'n Summ. J., Ex. 20.) Within ninety days of receipt of that letter, Plaintiff filed the instant lawsuit. The Complaint set forth six causes of action, as follows: (1) employment discrimination on the basis of sex/gender/race under 42 U.S.C. § 2000e; (2) employment discrimination on the basis of retaliation under 42 U.S.C. § 2000e; (3) violation of the equal protection clause based on race, under 42 U.S.C. § 1983, et seq.; (4) violation of the equal protection clause based on gender, under 42 U.S.C. § 1983, et seq.; (5) employment discrimination on the basis of sex/gender/race/retaliation, under the Pennsylvania Human Relations Act; and (6) aiding and abetting employment discrimination, under the Pennsylvania Human Relations Act.

Defendants filed the present Motion for Partial Summary Judgment on January 15, 2015. Plaintiff responded on January 29, 2015, and Defendants submitted a Reply on February 2, 2015. Based on a discovery dispute, Plaintiff was subsequently given until March 20, 2015 to file an amended response if desired, but she did not do so. The Motion is now ripe for consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion

8

for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

## III.  DISCUSSION

As noted above, Plaintiff alleges *quid pro quo* sexual harassment, hostile work environment, race discrimination, and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), et seq., 42 U.S.C. § 1983, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951.  Defendants now move for partial summary judgment on only Plaintiff's claims of retaliation and race discrimination.  The Court addresses each claim individually.[2]

### A.  <u>Retaliation</u>

Section 704(a) of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).  To establish discriminatory retaliation under Title VII, a plaintiff must

---

[2]  Notably, Plaintiff seeks dismissal of Defendants' entire Motion based on alleged willful violations of Rule 26.  In a somewhat incoherent argument, Plaintiff's brief seems to argue that Defendants' failed to turn over the "Epstein report" and other items including "sell phones," pictures, and forensic examiner names.  Moreover, Plaintiff appears to make a request that the Court strike some unidentified affidavits.

Aside from the fact that much of the argument, as presented by Plaintiff's counsel, is unintelligible, the Court is confident that discovery conflicts were resolved by the multiple discovery orders issued by the Court prior to considering the Motion for Partial Summary Judgment.  Indeed, by Order dated February 3, 2015, the Court extended the discovery deadline to allow Plaintiff to complete the depositions of all Defendants.  In addition, the Court gave Plaintiff until March 20, 2015 to file an amended response to the Motion for Partial Summary Judgment in the event that the depositions disclosed pertinent information.  Plaintiff did not avail herself of that opportunity, choosing instead to rest on her January 29, 2015 Response.  Satisfied that no discovery concerns remain, the Court proceeds to the merits of the Motion.

demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.[3]  Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995).  Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of retaliatory intent under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ("Price Waterhouse" ), or indirect evidence of retaliation under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ("McDonnell Douglas").  Given the absence of any direct evidence of retaliation in this case, the Court proceeds under the McDonnell Douglas standard.

    In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court set forth the precise framework for analyzing a claim based upon retaliation where, as here, there is no direct evidence of retaliation.  First, the plaintiff must prove, by a preponderance of evidence, a prima facie case of the three elements of retaliation: protected activity, adverse employment action, and causal relation.  McDonnell Douglas, 411 U.S. at 802.  If the plaintiff establishes a prima facie case, a "presumption" of retaliation is created and the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  Id. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981).  The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-

---

[3] The analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000).  Accordingly, the Court addresses the Title VII and PHRA claims jointly.

production determination necessarily *precedes* the credibility-assessment stage." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (emphasis in original).  The defendant satisfies its burden of production, and rebuts the plaintiff's prima facie showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, non-retaliatory reasons.  Id.

Finally, if the employer meets its burden of production, the presumption of discrimination created by the plaintiff's prima facie case "drops out of the picture."  Id. at 511 (citing McDonnell Douglas).  In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion."  Mitchell v. Miller, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original)).  "Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred."  Mitchell, 884 F. Supp. 2d at 371 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147–48 (2000)).

11

Upon a thorough reading of the Complaint and the parties' briefs, the precise basis of Plaintiff's retaliation claim remains somewhat ill-defined.  Indeed, the Court would be remiss to ignore the scattershot approach of Plaintiff's Response brief, which is filled with misspellings, incomplete sentences, incorrect references to exhibits, disjointed arguments, incorrect naming of individuals, and multiple grammatical errors.[4]  Nonetheless, attempting the Herculean task of logically reading Plaintiff's filings, the Court deduces that Plaintiff's retaliation claim is based on the alleged protected activity of (1) complaining about the remarks by Police Officer Pittoulis in 2010; and (2) complaining about the remarks made by Monica Frysinger in 2011.  Proceeding under the McDonnell Douglas analysis, Defendants now challenge this retaliation claim on two grounds.  First, they assert that Plaintiff has failed to establish causation as part of her prima facie case.  Second, and alternatively, they aver that even if Plaintiff can set forth a prima facie case, she has failed to create a genuine issue of material fact as to whether Defendants' legitimate non-discriminatory reason for her termination was pretext for retaliation.  The Court addresses these arguments separately.

## 1.    Causation

The third element of a prima facie case requires a showing of a causal connection between the plaintiff's protected activity and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Moore v. City of Phila., 461 F.3d 331, 341–42 (3d Cir. 2006).  To determine whether a plaintiff has met the causation element, the

---

[4]  These mistakes are doubly egregious in light of the fact that the Court gave Plaintiff an additional six weeks to file an amended response in order to incorporate any new discovery material.  While counsel apparently did not have anything new of substance to add, he could have, at a minimum, re-read his current brief and made an effort to correct some of the glaring errors.

court must consider all evidence that is "potentially probative of causation." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). Generally, temporal proximity of a retaliatory act to a protected activity is probative, but not dispositive of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512–13 (3d Cir. 2003). Stated differently, temporal proximity between the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)). To be "unusually suggestive" of a retaliatory motive, "the temporal proximity must be immediate." Lorah v. Tetra Tech, Inc., 541 F. Supp. 2d 629, 636 (D. Del. 2009). The Third Circuit has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell, 206 F.3d at 279 & n.5, whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003); see also Fischer v. Transue, No. Civ.A.04–2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (holding that temporal proximity of twenty-two days was insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. Civ.A.04–2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. Civ.A.05–19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was insufficient to establish causation); Killen v. N.W. Human Servs., Inc., No. Civ.A.06–4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) (holding that temporal proximity of seventeen days was insufficient to

13

establish causation).  "This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence."  Conklin v. Warrington Twp., No. Civ.A.06–2245, 2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009).

"[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third Circuit has demanded further evidence to substantiate a causal connection."  McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008).  "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint."  Id.  The Third Circuit has specifically remarked that, absent the unduly suggestive temporal proximity, a causal link between protected activity and adverse action may be inferred from "an intervening pattern of antagonism following the protected conduct, or the proffered evidence examined as a whole."  Peace-Wickham v. Walls, 409 F. App'x 512, 522 (3d Cir. 2010).  For example, the Court of Appeals has held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Abramson v. William Paterson Coll. of NJ, 260 F.3d 265, 289 (3d Cir. 2001); Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).  "Merely engaging in a protected activity prior to suffering an adverse employment action does not give rise to a harm cognizable as retaliation under Title VII or the ADEA."  Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home, No. Civ.A.13-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014).

In the present case, Plaintiff simply cannot establish any connection between her complaints about Pittoulis's remark in 2010 and Frysinger's remark in 2011, and the charges lodged against her in December 2011.  First, with respect to the complaint about Pittoulis, the

14

record remains devoid of any evidence on which a jury could find a causal link.  As is obvious from the record, temporal proximity is wholly lacking.  The incident with Officer Pittoulis—wherein Officer Pittoulis indicated that a white male inspector "liked his coffee black"—took place in July 2010 and Plaintiff reported it immediately to Deputy Commissioner Stephen Johnson.  Plaintiff's own disciplinary problems, however, did not commence until September 2011—well over one year later—thereby negating any unduly suggestive motive.

In an effort to close this temporal gap, Plaintiff suggests she suffered from a period of intervening antagonism following her complaint about Officer Pittoulis.  However, despite Plaintiff's reference to everything but the proverbial "kitchen sink," Plaintiff's citation of every stray remark, glare, and comment about her is insufficient to establish a plausible causal link.  First, Plaintiff contends that other females in the area where she worked began whispering and acting funny towards her.  (K. Johnson Dep. 91:2–15.)  Aside from the fact that Plaintiff offers only her gut feeling that the behavior of these individuals was connected to her complaint about Officer Pittoulis, Plaintiff has not shown that these individuals had any supervisory responsibility over her such that their actions could be imputed to her employer for purposes of the causal link.  See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (noting that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone amount to discrimination).

Moreover, Plaintiff asserts that numerous people started making comments about her attire.  Defendant Bates commented that because she was starting to lose weight after her pregnancy, her clothes did not look good on her and he wanted her to dress sexier.  (Id. at 91:16–92:14.)  Nothing in the record reflects that this behavior from Bates was connected to any

15

complaint about Officer Pittoulis, rather than simply a continuation of his alleged sexual harassment of Plaintiff.  Further, Plaintiff contended that Bates told her that Deputy Commissioner Johnson commented to him that someone told the Commissioner that Plaintiff was wearing a visible thong.  (Id. at 92:19–93:1.)  The triple hearsay nature of this testimony, together with the fact that there is no connection between it and Plaintiff's complaint about Pittoulis, make it an improper basis on which a jury could find a period of intervening antagonism.  Finally, Plaintiff contends that Inspector Mulvey, a female, complained to Plaintiff about her wearing of jeans, high heels, and sleeveless blouses and that she was counseled about her attire in March 2012.  (Id. at 93:12–94:5; Pl.'s Resp. Opp'n Summ. J., Ex. 8.)  Plaintiff, however, did not dispute that there was a dress code in place, that she wore high heels and sleeveless blouses, and that her attire may have violated the dress code.[5]  Nor did Plaintiff make any connection between Mulvey's comments to her and her complaint about Officer Pittoulis.[6]

Second, the Court likewise finds no causal connection between Plaintiff's complaint regarding Monica Frysinger's comments—specifically Frysinger's referring to Plaintiff as a "skinny crackhead"—and Plaintiff's reprimand and transfer.[7]  Plaintiff reported Frysinger's

---

[5]  Plaintiff indicated that she had to sign a document regarding her attire in the workplace indicating that she would dress more appropriately.  These events, however, occurred several months after she had already been formally charged with a policy violation.  (Pl.'s Resp. Opp'n Summ. J., Ex. 8.)

[6]  Plaintiff's brief spends several pages arguing "there is more," to preface a litany of alleged antagonism.  Merely reciting her accounts of daily workplace squabbles without connecting them in some way to the protected conduct does not a create a genuine issue of material fact as to causation.

[7]  The Court questions whether Plaintiff's complaint regarding Frysinger's comments was protected conduct, as they did not seem to oppose any unlawfully discriminatory conduct based on race, gender, or any other protected class.  Nonetheless, given Defendants' lack of argument

comment to Defendant Bates and to Corporal Newsome-Middleton.  (Id. at 94:20–95:14.)

Newsome-Middleton then reported this statement to Frysinger's supervisor, who conducted an

investigation and issued a written counseling memorandum to Frysinger.  (Long Aff. ¶¶ 1–6.)

These events, however, occurred in May to June 2011, more than three months prior to Plaintiff

being questioned about her fraudulent entry in the DAR, approximately six months before she

was formally charged with any wrongdoing, and just short of one year prior to her official

discipline and transfer—a span of time that eliminates any claim of temporal proximity.[8]

Plaintiff's effort to establish a period of antagonism between her complaint about

Frysinger and her later discipline is somewhat more tenable, though still insufficient to support

any inference of causation.  The investigation against Plaintiff in October 2011 was initiated as a

result of information received in an e-mail authored by Frysinger, which questioned the validity

of Plaintiff's DAR record entry for September 7, 2011.  (Defs.' Mot. Summ. J., Ex. 7.)  While

Frysinger's e-mail may or may not have been motivated by revenge for Plaintiff's prior

complaint about her, it is undisputed that Frysinger had no supervisory authority over Plaintiff,

meaning that her conduct or intention were not imputable to Defendants.  Moreover, the evidence

shows that Defendants' ultimate decision to transfer Plaintiff was prompted not by Plaintiff's

prior complaint about Frysinger, but rather was brought on by a fully independent investigation

of the allegations in Frysinger's e-mail, a formal citation of charges, and a hearing in which

---

on this point, the Court will presume, for purposes of this Motion, that Frysinger's comments
indeed constituted protected activity.

[8] Plaintiff asserts that only twenty-one days passed between the protected activity and the
retaliatory act by Frysinger.  (Pl.'s Resp. Opp'n Summ. J. 23.)  This is flatly incorrect.  Plaintiff
reported Frysinger on May 16, 2011.  Frysinger's email regarding Plaintiff's DAR activity,
however, did not occur until September 9, 2011.

Plaintiff had the opportunity to speak in her own defense.[9] Accordingly, the Court finds, as a matter of law, that Plaintiff has failed to establish a plausible causal connection between this complaint and her ultimate discipline.

Finally, the Court remarks that Plaintiff's intervening act of filing a complaint with the Equal Employment Opportunity Commission about these events does not create the requisite causal connection.  Frysinger sent an email reporting Plaintiff's alleged misconduct with respect to her leave on September 9, 2011.  (Def.'s Mot. Summ. J., Ex. 7.)  An investigation was conducted between September 12, 2011 and October 27, 2011.  (Id.)  On October 27, 2011, Lieutenant Joseph Martin, the investigating officer, issued a full report concluding that his investigation sustained improper conduct by Plaintiff in purposefully causing the falsification/misrepresentation of the September 7, 2011 DAR entries for her.  (Id.)   On December 14, 2011, Plaintiff was issued a Notice of Charges Filed, indicating the nature of her violation and that "[t]ransfer may be part of the formal disciplinary process."  (Defs.' Mot. Summ. J., Ex. 10.)  At that juncture, Plaintiff knew she was facing serious charges and that she could possibly be subject to transfer.  Just prior to her formal hearing on May 16, 2012 wherein she was officially found guilty of the charges—and well after a full investigation and

---

[9]  In a somewhat indecipherable discussion, Plaintiff argues that "the defendants have utterly omitted any discussion involving the Plaintiff's complaint to Bates and D.C. Stephen Johns [sic], then Fryberger's [sic] questionable DAR disclosure about the Plaintiff and Cpl. Newsome, which Fryburger [sic] allegation come [sic] days after Plaintiff reported Fryburger to Bates and Deputy commissioner Stephen Johnson (deceased)."  (Pl.'s Resp. 28.)   Assuming that Plaintiff meant Stephen Johnson as opposed to "Stephen Johns" and Frysinger as opposed to "Fryberger" or "Fryburger," Plaintiff is plain wrong that Frysinger's allegation about Plaintiff came "days" after Plaintiff's complaint about Frysinger.  As set forth above, the span between the two incidents was over three months, which, in the Third Circuit, is legally insufficient to constitute temporal proximity.

recommendation had been made—Plaintiff filed an EEOC charge complaining of the antagonism

by her co-workers, presumably because she had reported Pittoulis and Frysinger.  No evidence

exists, however, that Plaintiff's intervening act—taken while a pending disciplinary action

against Plaintiff was already well under way—caused Defendants to act any more harshly against

Plaintiff at the ensuing hearing.  To so conclude simply because of Plaintiff's well-timed charge

would disregard the principle that "[m]erely engaging in a protected activity prior to suffering an

adverse employment action does not give rise to a harm cognizable as retaliation under Title VII

or the ADEA."  Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home, No.

Civ.A.13-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014).

In short, although Plaintiff made several complaints about comments by fellow

employees, nothing in the record connects those complaints with her ultimate discipline and

transfer.  While some animosity clearly existed between Frysinger and Plaintiff, possibly

prompting Frysinger's complaints against Plaintiff, Defendants did not summarily discipline

Plaintiff based on Frysinger's word, but rather conducted an entirely thorough and independent

investigation of the incident before opting to discipline Plaintiff.  As such, the Court finds as a

matter of law that no reasonable juror could determine that Defendants' adverse employment

action toward Plaintiff was in retaliation for Plaintiff's complaints about either Pittoulis or

Frysinger, or her subsequent EEOC charge to that effect.[10]

_____

[10]  Plaintiff infers, without ever expressly asserting, that she was retaliated against directly
by Bates due to her protected activity of complaining about his sexual advances and telling him
to stop.  Plaintiff, however, does not develop this claim in any respect other than some randomly
placed arguments made in the context of arguing her other retaliation theories.  Moreover, the
record is devoid of a causal connection between any complaints about Bates's conduct and
Plaintiff's transfer.  Although Plaintiff's July 3, 2012 EEOC charge against Bates alleged that she
reported Bates's conduct in 2011 to a Lieutenant Craighead, Plaintiff presented no evidence,

##### 2.    Legitimate, Non-discriminatory Reason

Even assuming *arguendo*, that Plaintiff could establish a prima facie case, her claim of retaliation falters at the second and third steps of the McDonnell Douglas analysis.  As noted above, once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse employment actions.  All the employer needs to do at this juncture is introduce admissible evidence that, if taken as true, would "*permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons."  Mitchell, 884 F. Supp. 2d at 370 (emphasis in original).

Defendants, in this case, have done so.  According to the undisputed facts, on September 9, 2011, Defendants received an e-mail regarding possible misconduct by Plaintiff for fraudulently entering her time in the DAR system as funeral leave as opposed to sick leave. (Defs.' Mot. Summ. J., Ex. 7.)  The Police Department commenced an internal investigation, with Lieutenant Joseph Martin assigned.  (Id.)  Thereafter, Lieutenant Martin conducted an extensive investigation, including: a review of Department's Data Processing Unit; an interview

---

even in the form of her own testimony or an affidavit, that she did so.  Moreover, although Plaintiff testified at several points that when she shunned Bates's advances, Bates would threaten her job as his aide, these instances occurred in 2008 and 2010, well prior to her disciplinary action.  (K. Johnson Dep. 43:8–45:8, 53:11-54:16.)  Further, although she told Bates, by way of memorandum dated March 15, 2012, that she filed an EEOC charge, that charge did not include any allegations against Bates.  (Defs.' Mot. Summ. J., Ex. 12.)  Finally, Plaintiff did not report the sexual relationship to Corporal Newsome-Middleton until, at the earliest, June 17, 2012, after she had already resigned from the Police Department.  (Pl.'s Resp. Opp'n Summ. J., Ex. 4.) Ultimately, while Plaintiff has alleged a plausible quid pro quo sexual harassment claim against Bates, she has not produced any evidence that her complaints about such harassment were the basis for her ultimate transfer and alleged constructive termination from the Philadelphia Police Department.

of Monica Frysinger on September 12, 2011; an interview of Lieutenant Kevin Long on

September 12, 2011; an interview of Corporal Joseph Seidler on September 13, 2011; an

interview of Lieutenant Edward Appleton on September 13, 2011; an interview of Plaintiff on

September 16, 2011; and an interview of Corporal Gail Newsome-Middleton on October 5, 2011.

(Id.)   Based on this investigation, Lieutenant Martin made the following conclusions:

> The investigation **SUSTAINED IMPROPER CONDUCT** by **Police Officer Keisha Johnson #6968, Payroll #228615, Internal Affairs Division** in purposefully causing the falsification/misrepresentation of the 9-7-11 DAR entries for her in the Department's official records.

> Police Officer Johnson, during her IC interview, acknowledge that while being questioned on 9-8-11 by Corporal Newsome-Middleton about her absence from work on 9-7-11, she had asked Corporal Newsome-Middleton if she was entitled to funeral leave for her step-father's cousin (Ms. Mills). Both Civilian Frysinger and Corporal Newsome-Middleton stated that in response, Police Officer Johnson had been told by Corporal Newsome-Middleton that she (Johnson) was entitled to the leave and to bring in the obituary (documentation of death & services). However, Police Officer Johnson when questioned by Lieutenant Martin acknowledged that she had not attended any of the services for her step-father's cousin (Valarie Ms. Mills) on 9-7-11 for which she had been listed as funeral.

> The investigation **SUSTAINED IMPROPER CONDUCT** by **Police Officer Keisha Johnson #6968, Payroll #228615, Internal Affairs Division,** in purposefully causing or attempting to cause an unauthorized entry on the 9-7-11 DAR for her in the Department's official records.

> Police Officer Johnson when questioned during her IC interview about the conversation she had on 9-8-11 with Corporal Gail Newsome-Middleton concerning Johnson's status on 9-7-11 stated, "I told her I was sick . . . I told her [Corporal Gail Newsome-Middleton] that I had taken a sick day. Corporal Newsome-Middleton during her IC interview stated "I asked her [Johnson] what hours she worked she told me she left a message with Lieutenant Long calling out sick."

> P/O Johnson's assertion that she was off sick or believed that she should have been carried in sick status on 9-7-11 is improper. The police department only provides sick leave for an employee under certain conditions as specified in Philadelphia Police Department's Directive #66. The policy criteria listed in PD #66 specifies that sick leave with pay will be granted to an employee for absence from duty because of

> (1) [i]llness or non-service connected injury, (2) appointments with doctors or other recognized practitioner for treatment of such illnesses or injury to the extent of time required to complete such appointments, and (3) exposure to contagious diseases. It does NOT authorize a sick leave for persons in the care of that employee.

(Id.)  Plaintiff was then issued a Statement of Charges on December 19, 2011, indicating that transfer could be part of the disciplinary process.  (Defs.' Mot. Summ. J., Ex. 10.)  Following a full hearing by the Board of Inquiry on May 16, 2012, Plaintiff was found guilty by four different Police Department officials, and was issued a suspension notice on June 11, 2012.  (Defs.' Mot. Summ. J., Ex. 11.)  Given this background, such events certainly establish a legitimate non-discriminatory reason for Plaintiff's reprimand and transfer.[11]

The burden now shifts to Plaintiff to demonstrate that these reasons are nothing more than pretext.  As noted above, in order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes, 32 F.3d at 765.  "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion."  Mitchell, 884 F. Supp. 2d at 370 (emphasis in original)).  A plaintiff alleging employment

---

[11]  Plaintiff argues that Defendants had in their possession a micro cassette of the phone call, which revealed that Plaintiff actually called in sick.  That cassette was part of the investigatory record and, according to Plaintiff, the fact that Defendants chose to ignore it is suggestive of discrimination or retaliation.  The Court notes, however, that it was not the initial call-out that was problematic, but Plaintiff's subsequent statement to Lt. Newsome-Middleton that she had attended a funeral and wanted to use funeral leave that caused the fraudulent DAR entry.  Moreover, and in any event, Defendants found that Plaintiff improperly called out "sick" since sick time was to be used when the individual employee was ill or had to attend a medical appointment, not for care of a sick child.

22

discrimination on the basis of race or gender can show pretext in one of two ways: "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Under the law of this Circuit, it is incumbent upon Plaintiff to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765.

In an effort to do so, Plaintiff points to several scenarios where allegedly similarly-situated employees who committed the same or similar offenses were treated differently. To be "similarly situated" for the purposes of a workplace discrimination or retaliation case, "comparator employees 'must be similarly situated in all relevant respects.'" Philpot v. Amtrak, No. Civ.A.10-1276, 2011 WL 5339030, at *6 (E.D. Pa. Nov. 3, 2011) (citing Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011)) (further citations omitted). As the Third Circuit has explained, "[a] determination of whether employees are similarly situated takes into account factors such as the employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher, 441 F. App'x at 882. If two employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them," they will be deemed "similarly situated." McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir. 2011) (quotation omitted). By the same token, if their conduct differed in a way that would be material to an employer, they will

23

not be considered proper comparators.  Id.  In the discipline context, a plaintiff must show that

the alleged comparator's acts "were of comparable seriousness to his own infraction, and that the

[comparator] engaged in the same conduct without such differentiating or mitigating

circumstances as would distinguish the [comparator's] conduct or the employer's resulting

treatment of [him]."  Tyler v. SEPTA, No. Civ.A.99–4825, 2002 WL 31965896, at *3 (E.D. Pa.

Nov. 8, 2002), aff'd, 85 F. App'x 875 (3rd Cir. 2003).  "[S]ummary judgment is appropriate

where there is no evidence from which a jury could conclude the parties were similarly situated."

Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014).

Plaintiff first asserts that neither Pittoulis nor Frysinger, both of whom are white females,

were disciplined as harshly.  Yet, Plaintiff fails to show any parity between their misconduct and

that of Plaintiff.  After Pittoulis and Frysinger were accused of simply making inappropriate

comments in the workplace, they admitted their misconduct and were issued reprimands for such

actions.  Plaintiff, on the other hand, was accused of causing a fraudulent entry of leave into the

DAR system—an action that permitted her to obtain a paid day off when she would not have

otherwise been entitled to such pay.  Although she denied her wrongdoing, a full investigation

revealed otherwise and she was consequently reprimanded and transferred, but not terminated.

Plaintiff is now hard-pressed to reasonably argue that Pittoulis's and Frysinger's conduct rose to

the same level of seriousness as Plaintiff's.

Second, Plaintiff repeatedly refers to an unnamed white female who falsely called out on

funeral leave.  Yet, according to Plaintiff, that white female was not disciplined and was

permitted to correct the DAR instead.  Specifically, as described in Plaintiff's Declaration:

[T]here was another event where a white female reported out on vacation leave on

24

3-23-12.  That leave was subsequently changed to funeral leave by Lt. Long 12 days later.  The white female had a pattern of calling out sick, and last minute emergency vacation leaves.  The white female did not attend funeral services.  The white female was allowed to remove her vacation leave to funeral leave in the DAR report in order to save 8 hours vacation time.  There was no employment discipline brought against the white female.  This event is documented in my summary judgment opposition exhibits and is marked as exhibit #4.

(Pl.'s Resp. Opp'n Summ. J., Decl. of Keisha Johnson ("K. Johnson Decl."), ¶ 6.)  The sole evidence of record on this point, however, is a memorandum from Lt. Kevin Long who indicated that this employee had mistakenly been carried for eight hours of vacation time when the employee had actually attended a funeral on that day.  (Pl.'s Resp. Opp'n Summ. J., Ex. 4.) Attached to that memo is a letter from the employee giving all relevant information about the funeral services she attended including name, place, time, and relationship to the deceased.  (Id.) Notably, this evidence reflects a scenario where an employee was mistakenly docked vacation time for what should have been funeral leave, contrary to Plaintiff's situation where she was given funeral leave when she should have been docked vacation time.  More importantly, there is no evidence that the employee falsely reported any leave or that she did not attend the funeral services as she claimed.[12]

Finally, Plaintiff relies heavily on a situation where several white officers on the "shooting team" allegedly lied about working when they were not.  In her Declaration, she explains:

1.      I am aware because of my previous position at Internal Affairs that Lt.

---

[12]  Plaintiff's statement in her Declaration that this employee did not attend any funeral services is entitled to no weight as Plaintiff does not explain how she has any personal knowledge of this fact.  Moreover, Plaintiff's counsel's bald statement in her Response brief that the white employee's call out was "false" is insufficient to defeat summary judgment.  (Pl.'s Resp. Opp'n Summ. J. 21.)

     Mcdonald, Lt. Nolan, and Lt. Prendergast, all white male supervisors on the shooting team, had reported working the 8 x 4 tour of duty, when in fact they were not.  These white males were neither investigated nor disciplined for the event.

2.     The shooting team, DAR event occurred on 9-5-11, two days prior to me being accused of reporting off under funeral leave when in fact I called out sick.

3.     The reporting of working information by white males was placed in the Daily Attendance Record (DAR).  Their DAR entry allowed the white males to be paid, as working 8am to 4 pm, when they were not working.

4.     The same decision makers involved in my DAR event were the same people to make decisions for the shooting team event.

5.     The shooting team event had no investigation, charges or discipline, the event was common knowledge at Internal Affairs.

(K. Johnson Decl. ¶¶ 1–5.)  Notably, however, Plaintiff provides no detailed information demonstrating that these other employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them."  McCullers, 427 F. App'x at 195.  By contrast, Defendants offer the Affidavit of Captain Carol Scott-Abrams, who explains as follows:

1.     I am a Captain in the City of Philadelphia's Police Department Internal Affairs Bureau (IAD) and was responsible for overseeing the IAD Shooting Team from 2011-2012.

2.     The Shooting Team members are supervisors with the rank of lieutenant. They are on call 24 hours a day to investigate shootings when a police officer discharges their service weapon.

3.     There was a past practice of Shooting Team members being carried as working on the DAR system because of their 24 hour on call responsibilities. However, this practice was changed by me.

4.     No member of the Shooting team [sic] ever intentionally caused a fraudulent entry on the DAR system.

26

(Aff. of Captain Carol-Scott Abrams ¶¶ 1–4.)  Given the clear distinction in these circumstances, and the absence of evidence that the Shooting Team members committed any wrongdoing, the Court does not find that these employees are similarly situated.

In sum, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants' legitimate, non-discriminatory reason for disciplining Plaintiff was pretext for retaliation.  Plaintiff's denial that she violated any rules is of no moment in the face of evidence that Defendants fully and thoroughly investigated the allegations, held a hearing, and allowed Plaintiff to defend herself before concluding that she was guilty as charged.  Moreover, Plaintiff has not put forth any evidence of any similarly-situated employees that were treated differently than her.  Thus, on the record before the Court, no reasonable factfinder could either disbelieve Defendants' articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendants' action.  Fuentes, 32 F.3d at 764.  As such, the Court grants summary judgment on this ground as well.

### B. Disparate Treatment Based on Gender and Race[13]

Title VII of the Civil Rights Act of 1964 provides in relevant part that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff must first establish a prima facie case of race or gender discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was

---

[13]  Typical of the remainder of Plaintiff's Response brief, in the course of one page, Plaintiff puts forth a claim for "disparet treatment," "desperate treatment," and "disparate treatment."  (Pl.'s Resp. Opp'n Summ. J. 20.)

qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment

action; and (4) the action occurred under circumstances that could give rise to an inference of

intentional discrimination.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008); see also

Kimble v. Morgan Props., 241 F. App'x 895, 897–98 (3d Cir. 2007).  Because the prima facie

inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances

giving rise to an inference of discrimination are of *evidentiary value,* not whether they fit into a

mechanical formula."  Cobetto v. Wyeth Pharms., 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007)

(emphasis in original).

Defendants do not dispute the first three elements of the prima facie claim, as Plaintiff is

an African-American woman, she was qualified for the position of Police Officer, and her

transfer was an adverse employment action.  Defendants, however, argue that Plaintiff cannot

demonstrate the fourth element because she has not identified any conduct that can arguably give

rise to an inference of discrimination.  A plaintiff may demonstrate the circumstantial inference

of discrimination in many ways, but must produce "'evidence adequate to create an inference that

an employment decision was based on a[n] [illegal] discriminatory criterion . . . .'"  Pivirotto v.

Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (quoting O'Connor v. Consol. Coin

Caterers Corp., 517 U.S. 308, 312 (1996)) (alterations in original).  Showing that similarly

situated non-members of the protected class were treated less favorably is one of a variety of

methods to create an inference of discrimination.  Matczak v. Frankford Candy & Chocolate Co.,

136 F.3d 933, 939 (3d Cir. 1997) (citing Olson v. Gen. Elec. Astrospace, 101 F.3d 947 (3d Cir.

1996) ("favorable treatment outside the protected class is an 'alternative' element to a prima

facie case . . .")).  "The 'central focus' of the prima facie case 'is always whether the employer is

treating some people less favorably than others because of their race. . . .'" Sarullo v. U.S. Postal

Serv., 352 F.3d 789, 798 (3d Cir. 2003) (quoting Pivirotto, 191 F.3d at 352).

      As explained in great detail above, Plaintiff has not set forth any evidence of similarly-

situated male or white comparators being treated more favorably than Plaintiff.  Nor has Plaintiff

put forth any evidence from which a reasonable jury could find racial or gender-based animus

among decision-makers in the Philadelphia Police Department.  Plaintiff again references her

admonition for violation of a dress code that she believed did not prohibit the clothing about

which she was counseled, but Plaintiff does not indicate how that admonition was motivated by

either race or gender.  Further, Plaintiff repeatedly cites to her belief that she was treated

differently because of her race.  It is well established, however, that "[a]n inference of race [or

gender]-based discrimination cannot arise simply from an employee's subjective belief that his or

her race [or gender] somehow influenced the challenged employment action." Howard v.

Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 702 (W.D. Pa. 2010); see also Tillman v.

Redevelopment Auth., No. Civ.A.12-1505, 2013 WL 5594701, at *8 (E.D. Pa. Oct. 11, 2013)

("A plaintiff's own unsubstantiated, subjective beliefs of suspicions alone would not suffice to

persuade a rational trier of fact that age [or gender/race] was a factor in the termination

decision.").

      Even assuming *arguendo* that Plaintiff could establish a prima facie case of race or

gender discrimination, Plaintiff's claim still fails at the second and third prongs of the

McDonnell Douglas burden-shifting analysis.  As detailed in significant length above,

Defendants have put forth a legitimate non-discriminatory reason for Plaintiff's discipline.

Plaintiff has, in response, failed to put forth any evidence on which a reasonable factfinder could

deem this reason pretext.  Accordingly, Plaintiff's disparate treatment claim must be dismissed on this basis as well.

## IV.    CONCLUSION

The Court recognizes that this case involves very serious allegations of quid pro quo sexual harassment and hostile work environment.  Defendants, however, do not seek summary judgment on these claims.  Rather, Defendants move for summary judgment on Plaintiff's accompanying, but unsubstantiated, claims of race/gender discrimination and retaliation.  As to both of these causes of action, Plaintiff has neither established a prima facie case nor put forth evidence to undermine the veracity of Defendants' legitimate non-discriminatory reasons. Finding no genuine issue of material fact on either of these claims, the Court grants summary judgment on them in favor of Defendants and against Plaintiff.

An appropriate Order follows.